PROVIDED TO GULF CI
MAILROOM

JAN 1 4 2020

INMATE'S INITIALS

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
### (Panama City Division)
## CIVIL RIGHTS COMPLAINT FORM FOR
## PRO SE (~~NON~~-PRISONER) LITIGANTS IN ACTIONS UNDER
## 28 U.S.C. § 1331 or § 1346 or 42 U.S.C. § 1983

BRIAN EDWARD GLICK,
            *Plaintiff,*

Case No.: 5:20 cv 164 -TKW-MJF

**v.**

L. J. CORBIN,
J. C. LANIER,
Dr. R. MOLINA,
W. WARD, R.N.,
CENTURION OF FLORIDA,
MICHELLE SCHOUEST, IISC,
            *Defendants.*

_____/

**Jury Trial Requested?**
✓**YES** ☐ **NO**

FILED USDC FLND PN
JUN 10 '20 PM2:02

1

# I. PARTIES TO THIS COMPLAINT

A. Plaintiff(s)

1. Plaintiff's Name: **Brian Edward Glick**

Address: Gulf Correctional Institution;
500 Ike Steele Road

City, State, and Zip Code: Wewahitchka, Florida 32465
Telephone: *N.A.*

B. Defendant(s)

1. Defendant's Name: **L. J. Corbin**
Official Position: Correctional Officer
Employed at: Lowell C.I.
Mailing Address: 11120 NW Gainesville Road
Ocala, Florida 34482

☑ Sued in Individual Capacity ☐ Sued in Official Capacity

2. Defendant's Name: **J. C. Lanier**
Official Position: Classification Officer
Employed at: Mayo Correctional Institution Annex
Mailing Address: 8784 Hwy. 27 West
Mayo, FL 32066

☑ Sued in Individual Capacity ☐ Sued in Official Capacity

3. Defendant's Name: **Dr. R. Molina**
Official Position: Medical Director
Employed at: Mayo Correctional Institution Annex
Mailing Address: 8784 Hwy. 27 West
Mayo, FL 32066

☑ Sued in Individual Capacity ☐ Sued in Official Capacity

4. Defendant's Name: **W. Ward, R.N.**
Official Position: Primary Care Provider
Employed at: Gulf Correctional Institution
Mailing Address: 500 Ike Steele Road
Wewahitchka, Florida 32465

☑ *Sued in Individual Capacity* ☐ *Sued in Official Capacity*

5. Defendant's Name:     **Centurion of Florida**
Official Position:     Medical Contractor
Employed at:     Fla. Dept. of Corrections
Mailing Address:     501 South Calhoun Street
    Tallahassee, Florida 32399

*☑Sued in Individual Capacity ☐ Sued in Official Capacity*

6. Defendant's Name:     **Michelle Schouest, IISC**
Official Position:     Intensive Instructional Service Consultant
Employed at:     Fla. Dept. of Corrections
Mailing Address:     501 South Calhoun Street
    Tallahassee, Florida 32399

*☑Sued in Individual Capacity ☐ Sued in Official Capacity*

## II. BASIS FOR JURISDICTION

Are you bringing suit against (*check all that apply*):
☐ Federal Officials (*Bivens case*) ☑State/Local Officials (*§ 1983 case*)

## III. STATEMENT OF FACTS

1.     All of the claims in this case are related to one issue – Retaliation for complaining about conditions of confinement. Several related claims stem from that incident, including the failure to provide medical treatment of any kind for the Plaintiff's medical needs that were caused or aggravated by the retaliation. These issues have been occurring since March of 2019 and are continuing up to the time this Complaint is being drafted.

2.     In March of 2006, **Brian Glick** (the Plaintiff) was sentenced to Life in prison for second degree murder with a firearm. Shortly after entering the Florida Department of Corrections, Glick was seen by medical staff concerning a prior gunshot wound that had left a bullet lodged behind his right ankle.

3.     X-rays revealed that the bullet did not cause any bone damage and did not interfere with the function of the ankle joint, but that the bullet remained in the soft tissues directly behind the ankle.

4.     Although the bullet was causing some pain to Mr. Glick, medical staff decided against surgical removal of the bullet in favor of "symptom management" to avoid further complications, including possible nerve damage.

5.     Glick was issued several medical passes at that time, including a low-bunk pass and a no prolonged standing pass to help reduce the stress on his wound.

6.     Although Glick has weighed over 250 lbs. for the entirety of his time in prison, the condition of his wound remained stable for the next 13 years, causing only moderate pain during those times he put weight on his right leg. This was largely accomplished by Glick spending most of his commitment on lower bunks and by being assigned to easier job assignments the older he got.

7.     In March of 2019, Glick was housed at Mayo Correctional Institution Annex, where he was assigned as a certified inmate law clerk when the allegations of this civil rights Complaint began to take place. He was awaiting transfer to Florida's "Incentivized Prison Program", which he had been approved for since December of 2017 due to his superb prison record.

8.     At all times pertinent, **Centurion of Florida** (Defendant 5) was being contracted by the Fla. Dept. of Corrections to provide medical services to inmates.

9.     On March 21, 2019, Glick submitted an informal grievance complaining about Mayo's enforcement of a no longer existing rule that had required all inmates to remain in their class "A" uniforms Monday through Friday from 8:00am until 5:00pm.

10.    Several days later, Glick was paged to the captain's office by an officer present in the library area where Glick was assigned as a law clerk. Glick walked unescorted across the compound to the captain's office.

11.    Once inside, Captain **L. J. Corbin** (Defendant 1) confronted Glick with the informal grievance he had written, stating that the class "A" rule was Warden Lamb's "pet peeve", and that the Warden had instructed him to call Glick down to see if he needed any "special attention". He aggressively scolded Glick for drawing attention to himself, and then asked him how he thought the grievance would be answered – then yelling, "I have an answer!" with veins popping out of his neck.

12.    Grievances are normally only responded to in writing, making this incident peculiar from the beginning. During this entire intimidation session Glick was in fear of his safety for that reason, and due to Captain Corbin's threatening demeanor combined with his large body type and longstanding reputation for physically abusing inmates. Glick's fear was also magnified by the fact that there are no cameras inside the captain's office, making it an effective "blind spot" for inmate abuse.

13.    After 10 to 15 minutes of intimidation, Glick was allowed back to his dormitory.

14.    On March 29, 2019, Captain Corbin responded in writing to the grievance without approving or denying it, instead stating, "returned without action". Captain Corbin agreed in his written response that inmates were not required to be class "A" while off duty in the dormitory.

4

15.    On April 4, 2019, Glick filed a "copy request" to make 3 photocopies of the grievance, to send to news media and to prisoner's rights advocates. That request was approved and signed by the library supervisor, Mr. Frederick, and Glick was charged 0.45¢ for those copies from his inmate account.

16.    That afternoon, after returning to his dormitory, Glick was placed in hand restraints by Sgt. Anthony, and his property was packed up for confinement. He then escorted Glick back to the captain's office.

17.    Once inside, Captain Corbin again confronted Glick with the same grievance, this time in an all out rage. After a lengthy tirade about grievance writing, Captain Corbin yelled, "Wanna be a big shot? News reporters? This could have stayed between me and you! No one was f___ing with you! But you wanna f___ with me! Now I'm going to f___ with you!" (Curse words redacted out of respect).

18.    During this time Glick was handcuffed with his hands behind him, being held by Sgt. Anthony. Glick kept his head down in fear the whole time, and was struck in the back of the head by an officer while Captain Corbin continued ranting. After about 10 minutes Captain Corbin ordered Glick be taken to confinement, and that, "We'll figure out why later."

19.    The inmate orderly who made the photocopies for Glick's approved copy request was also taken to confinement by Captain Corbin that afternoon, for "spoken threat to staff".

20.    Glick had already been having trouble breathing while sleeping, but the problem became much more serious while in confinement, where he was not given a pillow and was unable to elevate his head. The lack of sleep and of oxygen while sleeping caused painful headaches and constant drowsiness. He was seen by medical staff after filling out a sick-call form shortly after being placed in confinement, but was not given any treatment at that time, per policy and practice of Centurion of Florida.

21.    On April 8, 2019, Glick was served a disciplinary report (DR) written by Captain Corbin for "disrespect", claiming that Glick was only present in the captain's office to be counseled "about a minor rule violation" when Glick suddenly exclaimed, "F___ you, you fat f___er, I ain't got time for this s___." (Cursing redacted out of respect).

22.    Glick pleaded not guilty to the DR, but was found guilty on April 11, 2019 at a hearing by classification officer **J. C. Lanier** (Defendant 2).

23.    Glick appealed the DR by filing a formal grievance alleging that Captain Corbin wrote the DR in retaliation for the class "A" grievance and for reaching out to the media. Warden Lamb approved the grievance on April 23, 2019, and the DR was expunged from Glick's record.

24.     Glick spent a total of 26 days in confinement, with hardly any sleep during that time, while suffering from debilitating headaches the entire time. He was finally given a pillow after his release from confinement, but continued to have trouble breathing while sleeping, which continued to cause periodic headaches of the worst severity. Some days were so bad that Glick could not get out of bed due to these headaches, which also caused nausea and acute light sensitivity.

25.     After being released from confinement, the library supervisor Mr. Frederick sent an email to classification officer Lanier asking for Glick to be allowed to resume his assignment in the law clerk program.

26.     Classification officer Lanier informed Mr. Frederick that Glick had served "DC time" for a DR, and so should not be assigned to the law library. Lanier instead assigned Glick to food service working in the pot room.

27.     On May 7, 2019, Glick filed an informal grievance about him not being allowed to resume his program assignment, at that point believing the decision to have been an inadvertent mistake.

28.     While working in the pot room, Glick was being required to stay on his feet for 10 to 12 hours a day, 5 to 6 days a week, as his medical passes had expired. The gunshot wound in his ankle began causing increased pain due to the added stress.

29.     On May 6, 2019, Glick filed a sick-call form regarding his leg, trouble breathing while sleeping, and headaches. Glick was seen by a nurse and then an optometrist (for severe light sensitivity) but was not given any treatment for those ailments at that time, per policy and practice of Centurion of Florida. The optometrist told Glick that tinted lenses could also not be issued without eye-disease "per policy".

30.     Glick followed up on his grievance about his job assignment, which were all denied. It became apparent that there was no mistake; Mr. Lanier knew full well that the DR he had found Glick guilty of had been expunged, yet he still refused Mr. Frederick's request to allow Glick to continue his program assignment as an inmate law clerk. No other reason was ever suggested besides what Mr. Lanier had already told Mr. Frederick – because of the retaliatory DR that Mr. Lanier himself had found Glick guilty of but that Glick had successfully appealed through the grievance procedure.

31.     Glick's medical conditions also continued to worsen, and **Doctor R. Molina** (Defendant 3) ordered X-rays for Glick's foot and an overnight infirmary stay to determine how serious Glick's sleep apnea was.

32.     Glick was eventually removed from the active food service roster, and classification officer Lanier changed Glick's job assignment to inside grounds, still refusing to allow him to resume his law clerk program assignment because of the DR he had received in retaliation for the class "A" grievance.

33.     After the X-rays were examined and Glick was again seen by medical, it was again decided against surgical removal of the bullet in favor of enhanced symptom management. Glick was issued medical passes for insoles, no-prolonged standing, and a cane.

34.     Glick was also kept overnight in the infirmary to monitor his pulse and oxygen while sleeping, which revealed serious dips in the oxygen levels throughout the night. On a follow up visit, a nurse informed Glick that a sleep study has been approved as a result. No further treatment has been provided to this date, due to the policies and practices of Centurion of Florida.

35.     After waiting several months, Glick filed a medical grievance on August 30, 2019, because he still had received absolutely no treatment for sleep apnea or its symptoms. His grievances were all denied, claiming he was approved for a sleep study. The final grievance was denied by **Michelle Schoest, IISC** (Defendant 6).

36.     Both Dr. Molina and Ms. Schoest were aware of Glick's suffering due to a difficulty breathing while sleeping, yet made no attempts to provide treatment despite their ability and duty to do so.

37.     Ultimately, Glick needs a C-Pap machine or similar breathing aid, which medical will not issue him until after a sleep study is conducted. Dr. Molina claimed in his grievance response that the sleep study was "out of his hands." The email sent to the nurse who first informed Glick that the sleep study was approved stated that it was to be conducted locally at Mayo, where Dr. Molina was the authority – but he simply chose to let Glick's sleep study be delayed indefinitely, despite several open cells in the medical wing. If left untreated, sleep apnea may cause death or permanent health deterioration.

38.     Dr. Molina also stated Glick had access to "mild pain relievers" from the officer station, but Glick had already informed medical that those were of little to no effect for his symptoms, and was in need of stronger medication. Dr. Molina could have prescribed Excedrin (or a similar generic brand) to relieve the pain being caused to Glick from his severe headaches as was recommended by Nurse Histand. He also could have provided Glick with a foam wedge to help keep Glick's head elevated while sleeping.

39.     Ms. Schoest was aware of these facts, had been trained as a medical professional, and was in a position of authority to remedy these problems by instructing Dr. Molina to administer treatment and by coordinating the needed sleep test, yet she chose to do nothing when confronted with Glick's complaints, and denied his final grievance for sleep apnea by blithely stating that Dr. Molina had "appropriately address[ed] the issues."

40.   A group of inmates that were at Mayo C.I. Annex as a result of damage caused by hurricane Michael to Gulf C.I. were returned to Gulf C.I. following repairs. Glick and the inmate who had made the photocopies of the class "A" grievance were both added to the list of inmates to be sent back to Gulf C.I. in further retaliation for writing grievances and reaching out to media and prisoner's rights advocates.

41.   Upon being told he was transferring, Glick believed he was being sent to the incentivized prison program, which he had been waiting for since December of 2017, with no other transfer pending. Prior to being loaded on the bus from Mayo, one of the officers who worked in the property area said to Glick and the other inmate, "sorry it took so long," and then winked his eye at them.

42.   Gulf C.I. is referred to as "the Gulf" by staff and inmates alike due to its reputation as a disciplinary camp that is difficult to be transferred away from and is located deep in the panhandle of Florida. The Gulf consists of older, run down dormitories with no air conditioning, and without security cameras on the compound outside the dormitories; whereas Mayo C.I. Annex is a much newer facility with AC in every dorm and security cameras covering most of the compound (except in the captain's office).

43.   Within a week of arriving at the Gulf (in October of 2019), nurse **W. Ward** (Defendant 4) revoked all of Glick's medical passes without any examination or appointment. Glick was simply informed of the decision after the fact and instructed to hand over all passes. Nurse Ward knew full well that Glick's previous medical care providers had prescribed him the use of a cane, a bottom bunk pass, insoles, and a no-prolonged standing pass to alleviate the pain being caused by a prior gunshot wound, and that Glick weighed over 250 lbs. Nurse Ward had full access to Glick's medical files, and also could have called Glick in for an appointment to make such a decision with such serious consequences.

44.   After surrendering his cane and passes, Glick was later moved to a top bunk and the pain in his right ankle became much worse as he was now forced to climb up and jump down off of a top bunk, and walk across the compound with no cane, and without any pass to allow him a break from standing on his wounded foot constantly, all while Glick remained over 250 lbs.

45.   Glick again filed medical grievances, this time for the revoking of his passes, which were finally denied by Ms. Schouest. She was again aware of Glick's medical needs but chose to do nothing again, despite her training as a medical professional and her responsibility to ensure medical care of inmates. Her response to Glick's grievance was the identical same 'boiler plate' answer stating that the institutional response "appropriately addresses the issue," which she also stated in her earlier denial of the sleep apnea grievance. Deliberate indifference is confirmed by Ms. Schouest's repeated pattern of ignoring serious medical needs of the inmates entrusted to her care.

46.    Glick was eventually moved back to a bottom bunk by security after several weeks of complaining, but the pain in his right ankle has become much worse as a result of the added stress over the last few months. His wound is in the worst condition it has been for over 15 years, and it now hurts Glick to walk even short distances unaided or to put any weight on his right leg.

47.    Glick has also not received any treatment for sleep apnea while at the Gulf, nor any "sleep test", despite sending in repeated inmate request forms asking for the status of the test.

48.    The written policies and the unwritten practices of Centurion of Florida (Defendant 5) have resulted in Glick not being treated for any of his medical conditions, and have allowed the treatment he was receiving to be taken away, making his condition much worse. These policies and practices were established with a deliberate indifference to the medical needs of all inmates which Centurion of Florida was contracted to care for, to minimize their own expenses and increase their profits at the expense of the inmates' health and well being.

## IV. STATEMENT OF CLAIMS

1.    Defendant **L. J. Corbin** violated Glick's First Amendment rights by first calling him into his office to intimidate him against filing grievances (para. 10-13). He again violated those rights when he had Glick handcuffed, berated, and beaten for attempting to reach out to the media regarding his grievance (para. 16-18). He also violated those rights by putting Glick in confinement for the same reasons, and for falsifying the DR that kept Glick in confinement for 26 days, and prevented him from returning to his program assignment as a law clerk (para. 18-26).

2.    Defendant **J. C. Lanier** violated Glick's First Amendment rights by refusing to allow him to return to his program assignment as a law clerk after he successfully appealed Lanier's finding of guilt for the DR Corbin had written, even after the library supervisor had requested Glick be reassigned (para. 26, 27, and 30). He also violated those rights for vindictively assigning Glick to work in food service and then inside grounds after Glick's successful appeal of Mr. Lanier's finding of guilt, despite Glick's certification as an inmate law clerk (para. 26-32).

3.    Defendant **Dr. R. Molina** violated Glick's Eighth Amendment right against cruel and unusual punishment by refusing to provide any medical treatment for Glick's sleep apnea condition or its symptoms, resulting in unnecessary, preventable pain and suffering due to his deliberate indifference of Glick's medical needs (para. 34-38).

4.      Defendant **W. Ward, RN** violated Glick's Eighth Amendment right against cruel and unusual punishment by revoking all of his medical passes without any valid intervening reason, despite the fact that those passes had been issued by various medical professionals due to the pain Glick was suffering from his prior gunshot wound as an alternative to the surgical removal of the bullet (para. 43-46). Nurse Ward also violated the same right by continuing to ignore Glick's sleep apnea condition, despite Glick's repeated efforts to receive treatment (para. 47).

5.      Defendant **Centurion of Florida** violated Glick's Eighth Amendment right against cruel and unusual punishment by failing to provide adequate policies and procedures to address inmates' medical needs, and intentionally allowing inmates with serious medical needs to go untreated due to their deliberate indifference policies (para. 48).

6.      Defendant **Michelle Schouest, IISC** violated Glick's Eighth Amendment right against cruel and unusual punishment by knowingly allowing all of Glick's medical conditions to go untreated, despite her training and knowledge of Glick's continued suffering both before and after his transfer to the Gulf (para. 35, 39 and 45).

## V. RELIEF REQUESTED

1.      Against Defendant **L. J. Corbin**, Glick is seeking monetary damages in the amount of $415,100.45. That amount would consist first of $100 in nominal damages for the fact of the violation of Glick's First Amendment rights. Next, Glick is seeking $15,000.45 in compensatory damages for the flagrant and substantial nature of the violation which resulted in the permanent aggravation of his physical injuries, and the 0.45 cents Glick paid to share his grievance with the media. Finally, Glick seeks $400,000.00 in punitive damages due to the insidious nature of the violation and the vulnerable condition of the aggrieved party, as well as for the gross abuse of authority Corbin had been entrusted with as a senior correctional official.

2.      Against Defendant **J. C. Lanier**, Glick is seeking monetary damages in the amount of $215,100. That amount would consist first of $100 in nominal damages for the fact of the violation of Glick's First Amendment rights. Next, Glick is seeking $15,000 in compensatory damages for the flagrant and substantial nature of the violation which resulted in the permanent aggravation of his physical injuries. Finally, Glick seeks $200,000.00 in punitive damages due to the insidious nature of the violation and the vulnerable condition of the aggrieved party, as well as for the gross abuse of authority Lanier had been entrusted with as a correctional official.

3.     Against Defendant **Dr. R. Molina**, Glick is seeking monetary damages in the amount of $205,100. That amount would consist first of $100 in nominal damages for the fact of the violation of Glick's Eighth Amendment rights. Next, Glick is seeking $5,000 in compensatory damages for the flagrant and substantial nature of the violation which resulted in unnecessary, preventable pain and suffering. Finally, Glick seeks $200,000.00 in punitive damages due to the serious nature of the violation and the vulnerable condition of the aggrieved party, as well as for the potential consequences of the violation, which could still result in Glick's death.

4.     Against Defendant **W. Ward, RN**, Glick is seeking monetary damages in the amount of $215,100. That amount would consist first of $100 in nominal damages for the fact of the violation of Glick's Eighth Amendment rights. Next, Glick is seeking $15,000 in compensatory damages for the flagrant and substantial nature of the violation which resulted in unnecessary, preventable pain and suffering as well as the permanent aggravation of his physical injuries. Finally, Glick seeks $200,000.00 in punitive damages due to the serious nature of the violation and the vulnerable condition of the aggrieved party, as well as for the potential consequences of the violation, which could result in further permanent injuries.

5.     Against Defendant **Centurion of Florida**, Glick is seeking monetary damages in the amount of $215,100. That amount would consist first of $100 in nominal damages for the fact of the violation of Glick's Eighth Amendment rights. Next, Glick is seeking $15,000 in compensatory damages for the flagrant and substantial nature of the violation which resulted in unnecessary, preventable pain and suffering as well as the permanent aggravation of his physical injuries. Finally, Glick seeks $200,000.00 in punitive damages due to the serious nature of the violation and the vulnerable condition of the aggrieved party, as well as for the potential consequences of the violation, which could still result in Glick's death.

6.     Against Defendant **Michelle Schouest IISC**, Glick is seeking monetary damages in the amount of $415,100. That amount would consist first of $100 in nominal damages for the fact of the violation of Glick's Eighth Amendment rights. Next, Glick is seeking $15,000 in compensatory damages for the flagrant and substantial nature of the violation which resulted in unnecessary, preventable pain and suffering as well as the permanent aggravation of his physical injuries. Finally, Glick seeks $400,000.00 in punitive damages due to the serious nature of the violation and the vulnerable condition of the aggrieved party, as well as for the potential consequences of the violation, which could still result in Glick's death, and for the gross abuse of authority Ms. Schouest had been entrusted with as a senior correctional official.

## VI. CERTIFICATION

As required by Federal Rule of Civil Procedure 11, I certify by signing below that to the best of my knowledge, information, and belief, this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a non-frivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.
I agree to timely notify the Clerk's Office if there is any change to my mailing address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date: 1-14-20  Plaintiff's Signature:

Printed Name of Plaintiff:    Brian E. Glick
Address:                      Gulf Correctional Institution;
                              500 Ike Steele Road
                              Wewahitchka, Florida 32465

E-Mail Address:        NA
Telephone Number:      NA